# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **INTERNATIONAL LONGSHORE AND WAREHOUSE UNION**, | Case No.: 3:12-cv-01494-SI |
| Plaintiff, | |
| v. | **OPINION AND ORDER** |
| **PORT OF PORTLAND**, **COMMISSIONERS OF THE PORT OF PORTLAND**, in their individual and official capacities; and **BILL WYATT**, in his individual and official capacity, | |
| Defendants. | |

Robert H. Lavitt, Schwerin, Campbell, Barnard, Iglitzin and Lavitt, LLP, 18 West Mercer Street, Suite 400, Seattle, WA  98119-3871; Robert S. Remar, Eleanor Morton, and Emily M. Maglio, Leonard Carder, LLP, 1188 Franklin Street, Suite 201, San Francisco, CA  94109. Attorneys for Plaintiff.

Randolph C. Foster, Jeremy D. Sacks, and Nathan C. Brunette, Stoel Rives LLP, 900 S.W. Fifth Avenue, Suite 2600, Portland, OR  97204. Attorneys for Defendants Port of Portland, Commissioners of the Port of Portland, and Bill Wyatt.

Gregory J. Miner, Bateman Seidel Miner Blomgren Chellis & Gram, PC, 888 S.W. Fifth Avenue Suite 1150, Portland, OR  97204. Attorney for Defendant Bruce Holte.

**SIMON, District Judge**.

This matter is one of six separate but related actions arising from a labor dispute at

Terminal 6 at the Port of Portland.[1] Briefly stated, the dispute concerns who may perform the

---

[1]  The other five cases are *Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*, Case No. 3:12-cv-01058-SI (D. Or.); *Pac. Mar. Ass'n v. Int'l Longshore & Warehouse Union Local 8*, Case No. 3:12-cv-01100-SI (D. Or.); *Hooks v. Int'l Longshore & Warehouse Union*,

work of plugging in, unplugging, and monitoring refrigerated shipping containers (the "reefer work") at Terminal 6. The International Longshore and Warehouse Union ("ILWU") and the Pacific Maritime Association ("PMA") contend that their collective bargaining agreement requires ICTSI Oregon, Inc. ("ICTSI"), the operator of Terminal 6 and a PMA member, to assign the reefer work to ILWU members. ICTSI, the Port of Portland, and the International Brotherhood of Electrical Workers ("IBEW") Local 48 contend that other contracts require that the reefer work be assigned to IBEW members.

Plaintiff ILWU brings this action against Defendants Port of Portland (the "Port"), the Commissioners of the Port of Portland, in their individual and official capacities (the "Commissioners"), and Bill Wyatt, in his individual and official capacities as Executive Director of the Port (collectively "Defendants"). ILWU asserts two claims for relief: violation of 42 U.S.C. § 1983, based on federal preemption of state labor regulation; and violation of Article XI, § 9 of the Oregon Constitution. First Amended Compl. ("FAC"). Dkt. 18. Before the Court is Defendants' Motion to Dismiss and Alternative Motions for Summary Judgment. Dkt. 21. For the reasons discussed below, the Court grants in part and defers in part Defendants' motions.

## BACKGROUND

The Port leases Terminal 6 at the Port of Portland to ICTSI. ILWU represents employees working for ICTSI at Terminal 6. In spring 2012, a labor dispute arose at Terminal 6 between ILWU, ICTSI, the Port, IBEW, and certain shipping companies (the "Carriers"). In response to this dispute, the Port established two programs: the Carrier Program and the Rent Program (collectively the "Programs").

---

Case No. 3:12-cv-1088-SI (D. Or.); *Hooks v. Int'l Longshore &Warehouse Union*, Case No. 3:12-cv-01691-SI (D. Or.); and *Pac. Mar. Ass'n v. N.L.R.B.*, Case No. 3:12-cv-02179-MO (D. Or.).

The Port established the Carrier Program to compensate Carriers "for losses [Defendant Wyatt] believes were sustained as a result of the [l]abor [d]ispute." FAC at ¶ 10. Under the Carrier Program, Carriers Hanjin, Hapag-Lloyd, and Westwood Shipping Company received payments from the Port for calling on Terminal 6. Hanjin received $70,000 per call; Hapag-Lloyd received $50,000 per call; Westwood received $25,000 per call. FAC at ¶ 11. According to minutes from the July 11, 2012, meeting of the Commissioners, Defendant Wyatt approved the Carrier Program "because if the vessels are not calling and they have to take their cargo to Tacoma or Seattle, it costs the region's shippers an additional $1,000-$1,500 per load. [Defendant Wyatt] said having the vessels calling [on] Portland is a tremendous advantage for the shippers[.]" Dkt. 1-1 at 4. The Carrier Program began in the summer of 2012, and concluded on August 1, 2012. *Id.* ILWU alleges that "at least a portion of the compensation paid to the [C]arriers would be paid from tax revenues[.]" FAC at ¶ 12.

On January 9, 2013, the Commissioners approved a renewed and modified version of the Carrier Program. Dkt. 39, Exs. A-B. According to an executive summary prepared for the January 9, 2013, meeting of the Commissioners, the modified Program provides for a "$10.00 per container incentive payment to calling carriers in a not-to-exceed program amount of $1,000,000 over an approximate 12-month period ending December 31, 2013." Dkt. 39, Ex. B.[2] The renewed Program "is justified as a means of helping sustain the mission critical nature of the

_____

[2] Both ILWU and Defendants submitted additional briefing, declarations, and documents after the Court held oral argument on Defendants' motions. Dkt. 38-41. Because the additional documents submitted by both parties form a basis of Plaintiff's claims, the Court will consider these documents as part of Defendants' motion to dismiss. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir.2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." (citations omitted)).

container franchise to shippers in the State of Oregon and throughout the region." *Id.* The payments will be paid out of rent received from ICTSI in 2012 and 2013. *Id.*

Under the Rent Program, the Port states that it "provides ICTSI with rent relief to partially offset the substantially increased operating costs and lost revenues directly attributable to the ILWU's misconduct." Defs.' Mem. at 4. Under ICTSI's lease, the fiscal year 2012/2013 annual rent, totaling $4,664,356, was due on July 1, 2012. Dkt. 25-3, Ex. 8 (letter agreement amending Terminal 6 lease). The Rent Program created a payment plan for the fiscal year 2012/2013 annual rent. *Id.* Under the this plan, ICTSI was permitted to make four installment payments in August, September, October, and November, each for 1/12 of the total fiscal year 2012/2013 rent, and a final balloon payment for the remainder of the rent on December 31, 2012. *Id.*

According to an executive summary of the agenda prepared in advance of the August 8, 2012, meeting of the Commissioners, the Port proposed the Rent Program in order to ameliorate ICTSI's financial losses caused by the labor dispute at Terminal 6:

> The cost-sharing program . . . is a commercial initiative designed to share half of certain increased operating costs and lost revenues sustained by ICTSI, which are directly attributable to the labor dispute.
>
> The Port is committed to being a partner with ICTSI through the duration of our long-term lease. The labor situation at Terminal 6 has resulted in a loss of business for ICTSI, financial loss and cargo diversion and delays to the local and regional shipping community, as well as a substantial loss of confidence in the Portland service by the local and regional shipping community and a loss of confidence by some of the shipping lines. . . .
>
> In order to assist ICTSI in managing the unplanned and significant financial losses, the Port is proposing entering into this cost-share agreement.

Dkt. 1-2 at 13. According to ILWU, "Defendant Wyatt recommend that the source of the $4,664,356 of funds should come from Defendant P[ort]'s General Fund." FAC at ¶ 13. The Port's August 8, 2012, executive summary states that "[t]he source of funds for this financial commitment will come from the Port's General Fund." Dkt. 1-2 at 13.

The Port approved a continuation of the Rent Program for 2013. Dkt. 39, Ex. C; Dkt. 41-2, Ex. B. According to an executive summary prepared in advance of February 13, 2013, meeting of the Commissioners, the continuation of the Rent Program "is designed to help maintain and grow container carrier service levels at Terminal 6." Dkt. 39, Ex. C. The contract between ICTSI and the Port for the renewed Rent Program expressly provides that the Port will not use tax revenues to fund the Program: "The sole source of funds for the Rebate Payments described above will be the Annual Rent payments paid to the Port from ICTSI under the Lease. None of the Port's tax revenues will be used to fund the Rebate Payments." Dkt. 41-2, Ex. B.

## STANDARDS

### A.    Motion to Dismiss

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations

of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir 2011). All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

## B.      Motion for Summary Judgment

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient[.] " *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255

(1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co.  v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotations and citation omitted).

## DISCUSSION

### A.    Standing

To establish constitutional standing, a plaintiff must demonstrate three elements:

> (1) *injury-in-fact*—plaintiff must allege concrete and particularized and actual or imminent harm to a legally protected interest; (2) *causal connection*—the injury must be fairly traceable to the conduct complained of; and (3) *redressability*—a favorable decision must be likely to redress the injury-in-fact[.]

*Barnum Timber Co. v. EPA*, 633 F.3d 894, 897 (9th Cir. 2011) (internal quotation marks and citations omitted) (emphasis in original). Defendants argue that for "both its Section 1983 claim and its constitutional claim, the ILWU has not pleaded an injury-in-fact that is 'fairly . . . traceable' to the Defendants' actions." Defs.' Mem. at 29 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). ILWU contends that it has suffered an injury in fact "because Defendants . . . authorized and implemented two [P]rograms to negate the economic pressure Plaintiff could exert on its collective bargaining partners." Pl.'s Opp'n at 25. ILWU has alleged that Defendants' Programs could have the effect of blunting ILWU's economic pressure against both ICTSI and the Carriers. FAC at ¶¶ 9-11. Thus, the ILWU has alleged an injury-in-fact sufficient to establish standing.

### B.    Section 1983 Claim

In its first claim for relief, ILWU alleges that Defendants' Programs violate 42 U.S.C. § 1983, which provides a cause of action against state and local governments their officials for violations of a person's federal constitutional or statutory rights. ILWU asserts that under two

preemption principles embodied in the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, it has a right "to be free from interference and from the exercise of regulatory and other governmental powers by public entities and public officials, such as Defendants, which have the intent or effect of influencing the outcome of the Labor Dispute[.]" FAC at ¶ 17. In *Golden State Transit Corp. v. City of Los Angeles*, the Supreme Court held that "the interest in being free of governmental regulation of the peaceful methods of putting economic pressure upon one another is a right specifically conferred on employers and employees by the [National Labor Relations Act]." 493 U.S. 103, 112 (1989) (internal quotation marks and citation omitted). This federal statutory right is enforceable under 42 U.S.C. § 1983. *See Michigan Bldg. & Constr. Trades Council, AFL-CIO v. Snyder*, 846 F. Supp. 2d 766, 782 (E.D. Mich. 2012) ("In *Golden State II*, the Court held that a city can be held liable under 42 U.S.C. § 1983 for violations of the [National Labor Relations Act].").

       1.     *Garmon* **and** *Machinists* **preemption**

ILWU's claim is founded on two preemption principles that have been derived from the text of the NLRA. The first principle, known as *Garmon* preemption, was first articulated in *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 238 (1959). *Garmon* preemption "prevents States not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act." *Wisconsin Dept. of Indus. v. Gould Inc.*, 475 U.S. 282, 286 (1986).

The second preemption principle was established in *Lodge 76, International Ass'n of Machinists & Aerospace Workers v. Wisconsin Employment Relations Commission*, 427 U.S. 132 (1976) ("*Machinists*"), and is known as *Machinists* preemption. *Machinists* preemption

"prohibits state and municipal regulation of areas that have been left 'to be controlled by the free play of economic forces.'" *Bldg. & Constr. Trades Council v. Assoc. Builders & Contractors of Mass./R. I., Inc.*, 507 U.S. 218, 225 (1993) ("*Boston Harbor*") (quoting *Machinists*, 427 U.S. at 140). Thus, "state or local action is preempted if it regulates the use of economic weapons that are recognized and protected under the NLRA such that the state or local government has entered 'into the substantive aspects of the bargaining process to an extent Congress has not countenanced.'" *New England Health Care, Employees Union, Dist. 1199 v. Rowland*, 221 F. Supp. 2d 297, 324-25 (D. Conn. 2002) (quoting *Machinists*, 427 U.S. at 149). "The *Machinists* rule creates a free zone from which all regulation, whether federal or State, is excluded." *Golden State*, 493 U.S. at 111 (internal citation and quotation marks omitted).

Thus, the NLRA creates two protected zones that must be kept free from state regulation. The *Garmon* rule creates a zone reserved for National Labor Relations Board ("NLRB") jurisdiction, and the *Machinists* rule creates a zone reserved for market freedom. *Boston Harbor*, 507 U.S. at 226-27 ("[T]he NLRA prevents a State from regulating within a protected zone, whether it be a zone protected and reserved for market freedom, *see Machinists*, or for NLRB jurisdiction, *see Garmon*."). ILWU contends that Defendants' Programs violates ILWU's rights under both *Garmon* and *Machinists* preemption.

### 2.    The market participant doctrine as an exception to preemption

The first step in deciding whether Defendants' Programs are preempted by the NLRA calls upon the Court to determine whether Defendants' Programs are the sort of regulatory action that is even subject to preemption. The NLRA "does not preempt actions taken by a state when it is [*sic*] acts as a mere proprietor or market participant." *Dillingham Constr. Inc. v. Cnty. of Sonoma*, 190 F.3d 1034, 1037 (9th Cir. 1999). This rule is known as the "market participant

doctrine." *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1022 (9th Cir. 2010).

The Supreme Court initially developed the market participant doctrine as part of its dormant

commerce clause jurisprudence. *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 807-10

(1976); *Reeves, Inc. v. Stake*, 447 U.S. 429, 436-40 (1980). The doctrine is now also applied in

cases addressing whether federal law preempts state or local regulation. *See, e.g., Engine Mfrs.*

*Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1042-43 (9th Cir. 2007) (Clean Air

Act); *Am. Trucking Ass'ns. v. City of Los Angeles*, 660 F.3d 384, 398 (9th Cir. 2011), *as*

*amended* (Oct. 31, 2011), *cert. granted in part*, 133 S. Ct. 927 (2013) (Federal Aviation

Administration Authorization Act); *Sprint Spectrum L.P. v. Mills*, 283 F.3d 404, 416-20 (2d Cir.

2002) (Telecommunication Act); *Associated Gen. Contractors of Am. v. Metro. Water Dist. of S.*

*Cal.*, 159 F.3d 1178, 1183-85 (9th Cir. 1998) (Employee Retirement Income Security Act).

The doctrine is also applied in cases involving claims of NLRA preemption. In *Boston*

*Harbor*, the Supreme Court explained that a state or local government may act within zones

otherwise protected by *Garmon* or *Machinists* preemption, so long as the government is acting

only as a proprietor:

> A State does not regulate . . . simply by acting within one of these
> protected areas. When a State owns and manages property, for example, it
> must interact with private participants in the marketplace. In so doing, the
> State is not subject to pre-emption by the NLRA, because pre-emption
> doctrines apply only to state *regulation*.
>
> Our decisions in this area support the distinction between
> government as regulator and government as proprietor. We have held
> consistently that the NLRA was intended to supplant state labor
> *regulation*, not all legitimate state activity that affects labor.

*Boston Harbor*, 507 U.S. at 226-27 (emphasis in original).

In "market participant cases, courts undertake 'a single inquiry: whether the challenged program constituted direct state participation in the market.'" *Engine Mfrs.*, 498 F.3d at 1040 (quoting *Reeves,* 447 U.S. at 435 n.7). When a "state entity directly participates in the market by purchasing goods or services," the state's action "falls within the market participant exception to preemption." *Johnson*, 623 F.3d at 1023. When, on the other hand, a state actor's "'purpose is not the efficient procurement of goods and services, but the furtherance of a labor policy,' a state actor is behaving 'in its capacity as a regulator rather than a market participant.'" *Tri-M Group, LLC v. Sharp*, 638 F.3d 406, 422 (3d Cir. 2011) (quoting *Chamber of Commerce of U.S. v. Brown*, 554 U.S. 60, 70 (2008)). There is no bright-line rule to determine whether state action is preempted or permissible. Rather, the court "must consider in each specific context if the government is acting like a private business or a governmental entity." *Selevan v. New York Thruway Auth.*, 584 F.3d 82, 93 (2d Cir. 2009).

Although the applicability of the market participant exception is determined by a "single inquiry," the Ninth Circuit has adopted a two-part test, known as the *Cardinal Towing* test, to guide that inquiry. *Johnson*, 623 F.3d at 1023. The Court asks:

> First, does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances? Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem?

*Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686, 693 (5th Cir. 1999). As explained by the Ninth Circuit:

> [T]he first *Cardinal Towing* question looks to the *nature* of the expenditure and protects comprehensive state policies with wide application from preemption, so long as the type of state action is essentially proprietary. The second question looks to the *scope* of the

Page 11 – OPINION AND ORDER

> expenditure and protects narrow spending decisions that do not necessarily
> reflect a state's interest in the efficient procurement of goods or services,
> but that also lack the effect of broader social regulation.

*Johnson*, 623 F.3d at 1024 (internal quotation marks and citations omitted) (emphasis in original). State "action need only satisfy one of the two *Cardinal Towing* prongs to qualify as market participation not subject to preemption." *Id*.

### 3.    Application of the market participant doctrine to Defendants' Programs

Defendants' Programs satisfy both of *Cardinal Towing*'s guiding questions. With respect to *Cardinal Towing*'s first question, the Programs reflect the Port's interest in guaranteeing the financial solvency of its tenant, ICTSI, rather than an effort to effect a general policy. The Port owns Terminal 6 and leases it to ICTSI. As such, the Port has a stake in ICTSI's financial stability. ICTSI's financial stability is, in turn, dependent on the Carriers' continuing to call on Terminal 6. The Port implemented the Programs at least in part to ameliorate the financial impact of the labor dispute on ICTSI. FAC at ¶¶ 11, 13; Dkt. 1-1 at 4; Dkt. 1-2 at 13. It is a strong indication that a government is acting as a market participant where the government's action has the effect of protecting the government's own financial interest.[3] *See Am. Trucking*, 660 F.3d at 401 (Port of Los Angeles was acting as a market participant where its actions were motivated in part by financial interest); *Boston Harbor*, 507 U.S. at 231-32 (NLRA does not prohibit a state from "manag[ing] its own property when it pursues its purely proprietary interests").

---

[3] There is also evidence that Defendants implemented the Programs at least in part in furtherance of their public mission. Dkt. 39, Ex. A (Defendant Wyatt states that the Port is "a public agency, and we have a mission here in Portland to keep container carrier access so that shippers from this region can access international markets."). A local government's action in furtherance of its public mission does not defeat application of the market participant doctrine. *Engine Mfrs. Ass'n*, 498 F.3d at 1046 ("that a state or local governmental entity may have policy goals that it seeks to further through its participation in the market does not preclude the doctrine's application").

There is, however, no indication that Defendants implemented the Programs in order to advance a general, regulatory policy. The Programs do not contain terms requiring ICTSI or the Carriers to take any actions with respect to their business relationships with any other entities. Nor do the Programs require ICTSI or the Carriers to alter their labor and employment policies. There is no allegation that the Programs are intended to advance any particular policy goal separate from generally advancing the Port's public mission and protecting the Port's interest in maintaining ICTSI's financial stability. *See Cardinal Towing*, 180 F.3d at 693 ("Cardinal does not claim, and we cannot find any suggestion, that the City was doing anything else other than setting specifications that would insure the efficient performance of the contract with the City for City police tows. There is no indication that it was trying to generally encourage the possession of class eight wreckers the way the state in *Gould* sought to encourage compliance with the NLRA" (internal footnote omitted)).

Finally, although it is not on its own dispositive, it is worth noting that the Programs lack a key indication of regulation: the threat of civil or criminal penalties. *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 438 F.3d 150, 157 (2d Cir. 2006), *aff'd*, 550 U.S. 330 (2007) ("A governmental entity acts as a market regulator when it employs tools in pursuit of compliance that no private actor could wield, such as the threat of civil fines, criminal fines and incarceration."). The Programs thus reflect Defendants' own proprietary interests. By design and in effect, the Programs attempt to ameliorate the financial impact of the current labor dispute on ICTSI and, thereby, protect the Port from losing this tenant. A private property owner facing similar circumstances could take similar actions. *See Johnson*, 623 F.3d at 1026-28 (college district's action satisfied first *Cardinal Towing* question where that action was comparable to private market behavior).

The Programs also satisfy *Cardinal Towing*'s second question. Several aspects of the Programs show that they are sufficiently narrow in scope to suggest that they are intended to address a specific, proprietary problem rather than encourage a general policy. First, both Programs affect only a limited and discrete set of entities. The Rent Program is an amendment to the Port and ICTSI's lease agreement; it does not affect any of the Port's other tenants. The Carrier Program provides incentives only to certain Carriers that call on Terminal 6. Those incentives are not generally available. The limited scope of the Programs thus further supports an inference that the Programs are proprietary. *See Sprint Spectrum*, 283 F.3d at 420 (school district's actions proprietary in part because it entered into single lease agreement with respect to a single building); *Cardinal Towing*, 180 F.3d at 695 (city's contract specification proprietary in part because they applied only to a single contract for police tows).

Second, the Programs are limited in duration. The Rent Program began in 2012 and is currently set to run only through 2013. The Carrier Program initially operated during the summer of 2012. In its new form, it will continue through 2013. "Narrow spending decisions tend to be expressly limited in time[.]" *Am. Trucking*, 660 F.3d at 399. Together, the scope and duration of the Programs defeat any reasonable inference that their primary goal was to advance a general policy rather than to address a specific, proprietary problem. *See Johnson*, 623 F.3d at 1028-29 (project labor agreement covering a single project sufficiently narrow in scope to satisfy second prong of *Cardinal Towing* test).

ILWU argues that the Programs "subsidize the labor costs and revenue losses of ICTSI and the [Carriers] arising from ILWU's labor dispute with ICTSI[.]" ILWU's Opp'n at 8. ILWU may be correct, but this argument is not a reason to reject the application of the market participant doctrine. The fact that the Programs may influence ILWU's labor dispute is not proof

that the Programs are regulatory. Defendants have a valid proprietary interest in protecting their tenant from the financial costs of a labor dispute. *Hotel Emps. & Rest. Emps. Union, Local 57 v. Sage Hospitality Res., LLC*, 390 F.3d 206, 217 (3d Cir. 2004) ("[T]he City has an interest in ensuring that labor strife does not damage the development."). It makes no difference if, absent application of the market participant doctrine, the Programs might be subject to NLRA preemption. The NLRA simply "does not preempt actions taken by a state when it is [*sic*] acts as a mere proprietor or market participant." *Dillingham Constr.*, 190 F.3d at 1037.

The Court concludes that in enacting the Programs, Defendants were acting as market participants. Defendants, therefore, are subject to neither *Garmon* nor *Machinists* preemption. Accordingly, ILWU's first claim is dismissed.

## C.    Article XI, Section 9 Claim

Article XI, § 9, of the Oregon Constitution provides that no "municipal corporation . . . shall become a stockholder in any joint company, corporation or association, whatever, or raise money for, or loan its credit to, or in aid of, any such company, corporation or association." The only public funds, however, that are protected by Article XI, § 9 are "tax revenues." *DeFazio v. Washington Pub. Power Supply Sys.*, 296 Or. 550, 579 (1984). Public "commitments or expenditures which incidentally benefit private entities do not violate Art. XI, § 9, unless they entail ultimate recourse against general tax revenues or do not serve a 'public purpose.'" *Nicoll v. City of Eugene*, 52 Or. App. 379, 383, *adhered to as mod. on reconsideration*, 53 Or. App. 528 (1981) (citing *Carruthers v. Port of Astoria*, 249 Or. 329, (1968)). "When government engages in public services or activities that generate revenues other than taxes, this court's past decisions have let government commit those revenues to financing its own projects or to support desired private projects[.]" *DeFazio*, 296 Or. at 579. In its second claim for relief, ILWU alleges that

Defendants have violated Article XI, § 9 because "if the Port were to exhaust its operational revenue, the debts it incurred under the [P]rograms would be ultimately borne by the [taxpayers]." ILWU's Opp'n at 20; *see also* FAC at ¶ 19. The parties agree that a small portion of the Port's revenue—approximately four percent—is obtained from taxes. Defs.' Mem. at 27 n.19.

In support of its claim, ILWU relies on two documents attached to its original complaint. The first is the minutes from the July 11, 2012, meeting of the Commissioners. Dkt. 1-1. This document records Defendant Wyatt's explanation of the Carrier Program to the Commissioners. There is no description of the source of the funds for the Carrier Program. The second document is an executive summary prepared in advance of the August 8, 2012, meeting of the Commissioners. Dkt. 1-2. This document describes the Rent Program. It states that the "source of the funds for [the Rent Program] will come from the Port's General Fund." *Id.* at 13. According to ILWU, these documents show that neither Program "explicitly prohibits the use of the Port's tax revenues to meet the Port's significant financial obligations under these [P]rograms." ILWU's Opp'n at 17. If either or both of the Programs did, will, or could draw on the Port's tax revenues, ILWU might have a valid claim under Article XI, § 9.[4]

---

[4] ILWU also argues that a local government's expenditure made to a private entity may violate Article XI, § 9, even if the expenditure is not payable from tax revenue, if the expenditure is not made for a public purpose. ILWU's Opp'n at 21. Oregon case law suggests that Article XI, § 9, requires expenditures made to private entities to be made for a "public purpose." *Nicoll*, 52 Or. App. at 383; *Thunderbird Motel, Inc. v. City of Portland*, 40 Or. App. 697, 704-06 (1979). Oregon courts have made clear, however, that the judgment about whether an expenditure is made for a "public purpose" is "more appropriate for legislative than judicial action." *Nicoll*, 52 Or. App. at 383 (quoting *Carruthers v. Port of Astoria*, 249 Or. 329, 341 (1968)). Thus, a court "should invalidate expenditures only where reasonable men could not differ as to their lack of social utility." *Id.* ILWU has not alleged facts sufficient to demonstrate that reasonable persons could not differ over whether the Port's Programs have social utility. Thus, to the extent that ILWU's Article XI, § 9 claim is based on a "public purpose" theory, it is dismissed.

Defendants argue, however, that ILWU's claim must be dismissed because the Port has not and will not use any of its tax revenues to fund the Programs. Defs.' Mem. at 26. In support of this assertion, Defendants submit the Declaration of Robert Burket, the Controller of the Port. Dkt. 24. In his declaration, Mr. Burket states that the "payments made by the Port under the Carrier Program have been funded completely from (and expensed against) the Port's Marine Division's non-tax operating revenues." *Id.* at ¶ 4. In addition, he states that all "payments under the ICTSI Rent Program have been, or will be, funded completely from (and are expensed against) the Port's Marine Division's non-tax operating revenues." *Id.* at ¶ 6. If Mr. Burket is correct that the Programs did not, will not, and cannot draw on the Port's tax revenue, ILWU does not have a valid claim under Article XI, § 9.

The Court cannot resolve whether ILWU has a valid claim without resorting to Mr. Burket's declaration. Unlike the meeting minutes and executive summaries of meetings of the Commissioners, which form the basis of ILWU's allegations, Mr. Burket's declaration is outside the scope of the pleadings. The Court, therefore, must treat Defendants' Motion to Dismiss and Alternative Motion for Summary Judgment as a motion for summary judgment. Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). Once construed as a motion for summary judgment, however, the Court must consider ILWU's motion under Federal Rule of Civil Procedure 56(d) for additional time to take relevant discovery. ILWU's Opp'n at 26. *See Michelman v. Lincoln Nat'l Life Ins. Co.*, 685 F.3d 887, 899 (9th Cir. 2012) ("Rule 56(d) offers relief to a litigant who, faced with a summary judgment motion, shows the court by affidavit or declaration that 'it cannot present facts essential to justify its opposition.'" (quoting Fed. R. Civ. P. 56(d)). The

documents attached to ILWU's complaint—in particular the executive summary prepared for the August 8, 2012, meeting of the Commissioners stating that funds for the Rent Program "will come from the Port's General Fund"—may raise factual questions that at least entitle ILWU to conduct appropriate discovery before the Court rules on Defendants' motion for summary judgment against ILWU's second claim. The Court, therefore, defers ruling on the motion for summary judgment until such time as ILWU has had a reasonable opportunity to conduct this discovery. ILWU may have 60 days in which to conduct discovery relating to its second claim and may file a supplemental response to Defendants' motion for summary judgment within 90 days from the date of this Opinion and Order.[5]

## CONCLUSION

Defendants' Motion to Dismiss and Alternative Motions for Summary Judgment, Dkt. 21, is **GRANTED IN PART AND DEFERRED IN PART**. With respect to ILWU's first claim for relief, alleging violations of 42 U.S.C. § 1983, the Court dismisses that claim with prejudice. With respect to ILWU's second claim for relief, alleging violations of Article XI, § 9, of the Oregon Constitution, pursuant to Federal Rule of Civil Procedure 12(d), the Court treats Defendants' motion as a motion for summary judgment and will defer ruling, pursuant to Rule 56(d). ILWU may have 60 days in which to conduct appropriate discovery relating to its second claim and may file a supplemental response to Defendants' motion for summary judgment within 90 days from the date of this Opinion and Order. Defendants may then respond within 14 days.

---

[5] Also included within Defendants' motions is a request that the Court strike ILWU's prayer for an award of "general and compensatory damages." Defs.' Mem. at 28. ILWU concedes that it "is not seeking compensatory or punitive damages from Defendants for its . . . Article XI, Section 9 [claim]." ILWU's Opp'n at 22. Because the Court has dismissed ILWU's § 1983 claim, ILWU no longer has a claim permitting it to recover general and compensatory damages. *See Hunter v. City of Eugene*, 309 Or. 298 (1990) (no right to damages on claim alleging violation of the Oregon Constitution). The Court, therefore, strikes ILWU's request for general and compensatory damages with regard to its Article XI, § 9 claim.

Pursuant to Federal Rule of Civil Procedure 54(2)(B)(i), the Court will defer consideration of any motion for attorney fees until after entry of judgment.

IT IS SO ORDERED.

Dated this 8th day of April, 2013.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge