## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **INTERNATIONAL LONGSHORE AND WAREHOUSE UNION**, | Case No. 3:12-cv-01494-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **PORT OF PORTLAND, COMMISSIONERS OF THE PORT OF PORTLAND**, in their individual and official capacities, and **BILL WYATT**, in his official capacity, | |
| Defendants. | |

Robert S. Remar, Eleanor I. Morton, and Emily M. Maglio, LEONARD CARDER LLP, 1188 Franklin Street, Suite 201, San Francisco, CA 94109. Robert H. Lavitt, SCHWERIN CAMPBELL BARNARD IGLITZIN & LAVITT LLP, 18 West Mercer Street, Suite 400, Seattle, WA 98119. Of Attorneys for Plaintiff.

Randolph C. Foster, Jeremy D. Sacks, Nathan C. Brunette, STOEL RIVES LLP, 900 S.W. Fifth Avenue, Suite 2600, Portland, OR 97204. Of Attorneys for Defendants Port of Portland, Commissioners of the Port of Portland, and Bill Wyatt.

Gregory J. Miner, BATEMAN SEIDEL MINER BLOMGREN CHELLIS & GRAM, PC, 888 S.W. Fifth Avenue, Suite 1150, Portland, OR 97204. Of Attorney for Defendant Commissioner Bruce A. Holte.

**Michael H. Simon, District Judge.**

Plaintiff International Longshore and Warehouse Union ("ILWU") brought this lawsuit against Defendants Port of Portland (the "Port"), the Commissioners of the Port of Portland, in their individual and official capacities (the "Commissioners"), and Bill Wyatt, in his official capacity as Executive Director of the Port (collectively, "Defendants" or "the Port").[1] On April 8, 2013, the Court dismissed with prejudice ILWU's first claim for relief, which alleged a violation of 42 U.S.C. § 1983. ECF 42. The Court deferred ruling on Defendants' Motion to Dismiss and Alternative Motion for Summary Judgment relating to ILWU's second claim for relief, which alleges a violation of Article XI, § 9 of the Oregon Constitution. *Id.* Before the Court are the parties' cross-motions for summary judgment relating to ILWU's claim under Article XI, § 9 of the Oregon Constitution (ECF 21, 49), ILWU's Motion for Leave to File a Second Amended Complaint (ECF 47), and ILWU's Motion to Strike Robert Burket's Clarification Declaration (ECF 48).

For the reasons discussed below, the Court grants Defendants' Motion for Summary Judgment (ECF 21), denies ILWU's Motion for Summary Judgment (ECF 49), denies ILWU's motion to Strike Robert Burket's Clarification Declaration (ECF 48), and denies as moot ILWU's Motion for Leave to File a Second Amended Complaint to add a claim for prevailing plaintiff attorney's fees (ECF 47).

## STANDARD

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[1] For convenience, the Court refers in this Opinion and Order to all Defendants as the "Port" and will rely upon context to indicate when the Court is only referring to the Port of Portland as an individual defendant.

Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . . " *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

Where parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the non-moving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the

non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

## BACKGROUND

The Port and ICTSI Oregon, Inc. ("ICTSI") are parties to a 25-year lease (the "Lease Agreement") under which ICTSI performs certain operations and administers certain facilities at Terminal 6 of the Port of Portland. ILWU represents employees working for ICTSI at Terminal 6. After a labor dispute arose in the spring of 2012, the Port implemented two programs to keep containerized goods flowing through, and certain shipping companies (the "Carriers") calling on, Terminal 6. These two programs are the Carrier Program and the Rent Program (collectively, the "2012 Programs"). The Port also continued certain aspects of the 2012 Programs into 2013 (collectively, the "2013 Programs").

### A.  The 2012 Programs

The Port's Carrier Program was the result of a "measurable and substantial decrease in both vessel and gate productivity" beginning in June 2012. Pl.'s Ex. F, ECF 51-9 at 57.[2] The 2012 Carrier Program offered tailored financial incentives to individual Carriers for a period commencing on June 21, 2012 and ending on July 24, 2012. Pl.'s Ex. F, ECF 51-9 at 40-47; Second Foster Decl. Ex. 5, Dep. Tr. of Bill Wyatt ("Wyatt Dep.") at 49:15-50:4, ECF 61-1 at 70. The Port's fiscal year runs from July 1 through June 30. Under the 2012 Carrier Program, the Port made three payments in August 2012, totaling $175,000, each of which was accrued and recorded in the Port's fiscal year that began on July 1, 2012, and ended on June 30, 2013. Schultz Decl. Ex. 1, ECF 59 at 7-8, 10.

---

[2] The Court cites to the CM/ECF pagination rather than to the internal pagination provided by the parties.

The Port also implemented the 2012 Rent Program, which the Port Commission adopted

on August 8, 2012. First Thompson Decl. Ex. 6, ECF 25-3 at 19-24. Mr. Wyatt described the

motivation for the Rent Program as follows:

> The Rent Program was developed in 2012 and it was essentially an
> effort by the Port to share in what were the considerable losses
> being incurred by ICTSI as a result of the intentional slowdown
> and the resulting productivity creating a tremendous loss for
> ICTSI. And so we were, frankly, very concerned that their business
> was threat [*sic*]—they might close their doors, and so we
> developed this cost sharing program to at least do what we could to
> help mitigate this prospect.

Wyatt Dep. at 9:13-10:6, ECF 61-1 at 61. The Port authorized the Rent Program at "an amount

not to exceed $4,664,356," with the funding coming from the Port's General Fund. Pl.'s Ex. F,

ECF 51-8 at 56-57. Mr. Wyatt explained that the cost of the 2012 Rent Program was based on

"the amount of the annual rent payment from ICTSI to the Port of Portland" and that the Port

would use the rent ICTSI paid to the Port to "manage this reimbursement program." *Id.* at 64.

The 2012 Rent Program agreement between the Port and ICTSI took effect on August 8,

2012, and was scheduled to terminate on the earlier of: (i) the date on which the Port had paid the

maximum amount of $4,664,356; (ii) December 31, 2012; or (iii) the date of the occurrence of a

default by ICTSI as defined in the Lease Agreement. *Id.* at 72. The actual payments to ICTSI

under the 2012 Rent Program totaled $2,688,672. Schultz Decl. Ex. 1, ECF 59 at 7, 9, 10;

Second Foster Decl. Ex. 14, ECF 61-4 at 70.

The Port maintained that "property taxes would not be used in the cost sharing program

[the 2012 Rent Program]." Wyatt Dep. at 20:17-20, ECF 61-1 at 63. Mr. Wyatt articulated this

position to the Port Commissioners before their approval of the 2012 Rent Program on August 8,

2012. Pl.'s Ex. F, ECF 51-8 at 64 (explaining that tax money will not be used to fund the

program). The Port also required that ICTSI sign a Supplemental Agreement on October 26,

2012, confirming that tax revenues would not be used to support or finance the 2012 Rent

Program and that only ICTSI's annual rent payments would be used to finance the 2012 Rent

Program and expressly waiving any right by ICTSI to make any claim under the 2012 Rent

Program against the Port's tax revenues. First Thompson Decl. Ex. 10, ECF 25-3 at 41-43.

**B. The 2013 Programs**

Because of the ongoing economic effect of the labor dispute that began in 2012, the Port

developed two additional programs to assist ICTSI in managing its increased operational costs.

The Port again implemented a two-fold approach: the 2013 Carrier Program and the 2013 Rent

Program. These 2013 Programs were based on concerns that Carriers were considering no longer

stopping at the Port and, if that happened, shippers then would have to reroute their cargo

through other ports. Wyatt Dep., ECF 61-1 at 49.

On January 9, 2013, the Port approved the 2013 Carrier Program. That program was

similar to the 2012 Carrier Program and designed to "help induce the carriers to continue calling

on Terminal 6." Wyatt Dep. at 49:16-50:14, ECF 61-1 at 70. The terms of the 2013 Carrier

Program, however, offered a different incentive structure. The Port offered a "per container

incentive payment [of ten dollars] to calling carriers in a not-to-exceed program amount of

$1,000,000 over a period ending December 31, 2013." Foster Decl. Ex. 14, ECF 61-4 at 11.

Under the 2013 Carrier Program, the "carrier incentive payments would be paid out of rent

received from ICTSI during 2012 and 2013 under the Terminal 6 Lease." *Id.*; *see also id.* at 12

(stating that the "source of funds for this program will come from non-tax revenues of the Port").

Under the individual agreements with each participant, the Carriers "expressly

disclaim[ed] and waiv[ed] any and all right to make a claim against the Port's tax revenues to

satisfy any of the Port's obligations in any way arising out of the [2013 Carrier] Program."

Second Thompson Decl. Exs. 2-8, ECF 60 at 2-29. As of October 31, 2013, the total payments

made under the 2013 Carrier Program amounted to $631,620, which was distributed among six participating Carriers. Schultz Decl. Ex. 1, ECF 59 at 7, 9-10.

On February 13, 2013, the Port approved the 2013 Rent Program. Foster Decl. Ex. 13, ECF 61-3 at 136. The "sole source of funding" approved by the Port for the 2013 Rent Program was the "Annual Rent payments paid to the Port from ICTSI under the Terminal 6 Lease Agreement." *Id.* The Port's 2013 Rent Program provided that "[n]one of the Port's tax revenues will be used to fund the rebate payments and ICTSI expressly disclaims any right to any Port tax revenues to satisfy the Port's rebate obligations under the Rent Rebate Agreement." *Id.*

The Port also entered into an agreement with ICTSI related to ICTSI's annual payments to the Port (the "2013 Rent Program"). The 2013 Rent Program between the Port and ICTSI was scheduled to terminate on December 31, 2013, subject to any earlier termination contingency. *Id.* The 2013 Rent Program further provided that the Port would make payments to ICTSI of $308,333 per month (the "Rebate Payments") for each calendar month during 2013 and not to exceed $3,700,000. Foster Decl. Ex. 17, ECF 61-5 at 49. The source of funding for the Rebate Payments would be the "Annual Rent payments paid to the Port from ICTSI under the Lease," and "[n]one of the Port's tax revenues [would] be used to fund the Rebate Payments." *Id.*

As with the October 26, 2012 Supplemental Agreement, ICTSI agreed that tax revenues would not be used to support or finance the 2013 Rent Program and that only ICTSI's annual rent payments would be used to finance the 2013 Rent Program; ICTSI also expressly waived any rights to make any claim under the 2013 Rent Program against the Port's tax revenues. *Id.* In July 2013, ICTSI made its required Annual Rent payment of $4,733,104. Wyatt Dep. at 55:4-13, ECF 61-1 at 71; Schultz Decl. Ex. 1, ECF 59 at 7, 9. As of October 31, 2013, the Port had spent a total of $2,560,397 on the 2013 Rent Program. Schultz Decl. Ex. 1, ECF 59 at 7, 9, 11.

**C.  The Port's Financial Management Systems**

The Port uses internal financial management systems to administer its fiscal policies. Relevant to this dispute, the Port has two primary bank accounts. The first account is the Local Government Investment Pool Account ("LGIP Account"), from which the Port receives property taxes that are collected by local governments on the Port's behalf. Maglio Decl. Ex. C, Dep. Tr. of Robert Burket ("Burket Dep.") at 48:19-25, ECF 51-3 at 26. The second account is maintained at Wells Fargo, where the Port keeps its primary bank account (the "General Fund"). *Id.* at 31:19-25, ECF 51-3 at 15. The parties agree that the expenses for the Programs were paid from the Port's General Fund, and specifically from the Port's Marine Division. *Id.* at 37:6-38:2, ECF 51-3 at 18-19. The parties also agree that funds from the LGIP Account are regularly transferred into the General Fund to be dispersed and allocated by the Port. *Id.* at 90:3-91:1, ECF 51-3 at 40-41.

The parties disagree over how to characterize or describe how the General Fund functions under the Port's financial management systems. The Port argues that it created and maintained two relevant accounting processes to manage its revenues: first, the Port uses internal tracking processes to divide the General Fund into separate "buckets" properly to account for tax revenues; and second, the Port has a formal accounting process whereby tax revenues within the General Fund are kept separate from non-tax revenues.

With regard to the internal tracking processes, the Port segregates the General Fund into four primary "buckets," consisting of: (1) the Strategic Fund; (2) the Coverage Fund; (3) the Investment Fund; and (4) the T6 Fund. Second Foster Decl. Ex. 7 ("Overview of Fund Sources and Uses"), ECF 61-2 at 3. At issue in this lawsuit is the Port's fiscal management of the Coverage Fund and the T6 Fund. Second Foster Decl. Ex. 4 ("Schultz Dep.") at 26:18-33:17, ECF 61-1 at 44-46. The Coverage Fund receives its funding from property taxes and operating

PAGE 8 – OPINION AND ORDER

income before depreciation. Second Foster Decl. Ex. 7, ECF 61-2 at 3. The Coverage Fund is used for debt service, capital leases, capital investments that cannot earn a financial return (*i.e.*, asset maintenance), and to make up for investment return deficits in the Investment Fund. *Id.* The sole sources of funding for the T6 Fund are the initial ICTSI closing payment for the Lease Agreement and ongoing lease revenues from ICTSI. *Id.* The T6 Fund is dedicated to capital obligations related to the Lease Agreement, the Carrier Programs, and the Rent Programs. *Id.* The Port argues that its financial records for the T6 Fund and Coverage Fund conclusively demonstrate that no property taxes were directed toward or were used to finance the Programs.

In addition to these tracking procedures, the Port implemented a formal accounting procedure to segregate tax revenues. This system is based on the Port's financial management tracking by operating division. The Port has two primary divisions: (1) General Port Operations, and (2) Aviation. Burket Decl. Ex. 5, ECF 58-3 at 31. Within General Port Operations, there are several subdivisions or operational units, including Marine & Industrial Development (the "Marine Division"). *Id.* at 3-31. Separate from the Port's operating fund (the General Fund), the Port tracks "Construction Funds," including the Port's Bond Construction Fund. *Id.* The Bond Construction Fund "accounts for the acquisition, construction, expansion, and improvement of new and existing structures and facilities. Its resources are generated from property taxes, transfers from the General Fund and Airport Revenue Fund, and interests on investments." *Id.* at 69. In November 2012, the Port assigned all property tax revenue to the Bond Construction Fund, which "exists both in the Port's budget and in its accounting systems." Burket Decl., ECF 58 at 6 ¶ 14. This decision was made retroactive to July 1, 2012, the first day of the Port's 2012-2013 fiscal year. *Id.* at 7 ¶ 15. "The assignment and allocation of all the Port's property tax revenue to the Bond Construction Fund has been maintained in the current fiscal year budget and

in the Port's accounting systems." *Id.* at 8 ¶ 15. The Port argues that this formal segregation of funds indicates that all funding for the Programs is documented as being from the Marine Division and that tax revenues were kept separate in the Bond Construction Fund. *Id.* at 8 ¶ 16.

ILWU contends that funds transferred from the LGIP Account into the General Fund are comingled, such that there is no way to distinguish between property taxes and non-tax revenues. Maglio Decl. Ex. A (Report by ILWU's accounting expert, Vanessa J. Hill, "Hill Report"), ECF 51-1 at 17-20, 54 at 2. ILWU further argues that even if the Port properly segregated its funds, the Port lacked sufficient operating income to guarantee that non-tax revenues would provide the entire funding source for the Programs. *Id.* ILWU also argues that the T6 Fund is not in the Port's accounting records, not subject to written guidelines, not intended to fund non-capital expenditures, not administered or calculated consistently, and not completely segregated from property taxes. *Id.* at 28. Finally, ILWU argues that any separate agreement or disclaimer between ICTSI or the Carriers, on the one hand, and the Port, on the other, does not guarantee that property taxes were not used and will not be used in the future to finance the Programs. *Id.* at 27.

## DISCUSSION

### A.  Evidentiary Objections

ILWU moves to strike the corrections submitted by the Port to the deposition testimony of Robert A. Burket. In addition, ILWU raises an evidentiary objection challenging the Port's audited financial statements for its fiscal year ending on June 30, 2013. Each issue is addressed in turn.

#### 1.  Motion to Strike

ILWU moves to strike the deposition corrections of Mr. Burket, arguing that the deposition corrections violated Federal Rule of Civil Procedure 30(e) ("Rule 30(e)") and that the

corrections are a "sham" meant to create an issue of fact for summary judgment. The Port responds that Mr. Burket's deposition corrections are consistent with his testimony and that striking the corrections because they were filed a few days after the Rule 30(e) deadline would be unjustified.

Rule 30(e), which governs changes to deposition transcripts, provides:

> (1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:
>
> > (A) to review the transcript or recording; and
> >
> > (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

Fed. R. Civ. P. 30(e). In addition to the procedural requirements of Rule 30(e), the Ninth Circuit extends the "sham" affidavit rule to deposition corrections, holding that Rule 30(e) deposition corrections cannot be used to create an issue of fact by contradicting prior deposition testimony. *Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*, 397 F.3d 1217, 1225 (9th Cir. 2005). "Rule 30(e) is to be used for corrective, and not contradictory changes." *Id.* at 1226. To justify striking a deposition correction as a "sham," the "inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (discussing the sham affidavit rule).

When determining whether deposition corrections are a "sham" or intended to create an issue of fact for summary judgment, the timing of the deposition changes is informative. In *Hambleton*, the court affirmed the magistrate judge's decision to strike an errata sheet as a sham and a violation of Rule 30(e) when the deposition occurred in late 2001, the defendants filed a motion for summary judgment in January 2002, and the plaintiffs submitted the deposition

corrections in February 2002. *Hambleton*, 397 F.3d at 1223-24. The court indicated that the sequence of the deposition corrections, submitted after the motion for summary judgment was filed, was "seemingly tactical." *Id.* at 1225. The court further noted that in addition to filing the corrections after the 30-day deadline, the plaintiffs omitted a statement in the errata sheet "explaining the corrections, despite the fact that the plain language of the Rule requires that a statement giving reasons for the corrections be included," which was a second indication that the corrections were a "sham." *Id.* at 1224. "A statement of reasons explaining corrections is an important component of errata submitted pursuant to [Rule] 30(e), because the statement permits an assessment concerning whether the alterations have a legitimate purpose." *Id.* at 1224-25. Finally, the court acknowledged the magistrate judge's legitimate concern regarding the "extensive nature" of the deposition corrections. *Id.* at 1225.

Although the court in *Hambleton* affirmed the lower court's decision to strike the plaintiffs' deposition corrections based on the procedural requirements of Rule 30(e), the court left room for the possibility that in different circumstances, a small procedural error might not justify the exclusion of Rule 30(e) corrections. *See id.* at 1224. The court indicated that had it not been for the suspect timing of the errata, the lack of explanation, and the extensive nature of the corrections, "[m]issing the thirty day deadline by a mere day or two might not alone justify excluding the corrections in every case." *Id.* at 1224; *see also EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 266 n.12 (3d Cir. 2010) ("The natural language of the rule . . . does not preclude courts from allowing more time upon a prior request or forgiving minor untimeliness after the fact."); *BNSF Ry. Co. v. San Joaquin Valley R. Co.*, 2009 WL 3872043, at *6 (E.D. Cal. Nov. 17, 2009) ("The *Hambleton* approach has been recognized as involving some discretion to enforce the thirty-day requirement strictly or not.").

In this case, Mr. Burket's deposition was taken on July 31, 2013. Burket Dep., ECF 61-1 at 11. On August 13, 2013, the court reporter notified the Port that the transcript was available. Second Foster Decl. Ex. 21 (Court Reporter Letter), ECF 61-5 at 67. Mr. Burket submitted his errata sheet to ILWU on September 16, 2013, 34 days after the court reporter provided notification of the transcript's availability. Second Foster Decl. Ex. 22 ("Burket Errata"), ECF 61-5 at 69. Although the Port submitted Mr. Burket's disposition corrections four days beyond the Rule 30(e) deadline, the timing of the deposition corrections was not "seemingly tactical." *See Hambleton*, 397 F.3d at 1225. Unlike *Hambleton*, where the defendants filed a motion for summary judgment in the month between the deposition and the deposition corrections, here ILWU filed a motion for summary judgment two weeks *after* receiving Mr. Burket's deposition corrections.[3] *See* Pl.'s Mem., ECF 50. Based on the Port's "minor untimeliness," there is no reason to infer that Mr. Burket's deposition corrections were a sham. Moreover, there is no indication that ILWU suffered any unfair prejudice from receiving the corrections four calendar days (or two business days) late.

Other than its untimeliness, Mr. Burket's deposition corrections complied with the procedural requirements of Rule 30(e). Mr. Burket's counsel invoked Mr. Burket's right to review the transcript of the deposition before the conclusion of the deposition on July 31, 2013.[4]

---

[3] Although the Port's Motion to Dismiss and Alternative Motion for Summary Judgment was pending at the time the Port submitted Mr. Burket's deposition corrections, that motion had been pending for six months before Mr. Burket's deposition.

[4] ILWU does not dispute that the request was made but argues that it was not made on the deposition record. Based on the text of Rule 30(e), which provides "[o]n request by the deponent or a party before the deposition is completed," there is no reason to conclude that the request for review must be made on the official deposition record. Moreover, no Ninth Circuit case suggests that the request must be on the record, and district courts have interpreted the plain text of Rule 30(e) as not requiring a request on the record. *See BNSF Ry. Co.*, 2009 WL 3872043, at *8 ("[T]here does not appear to be binding authority in this circuit that would require that a request absolutely appear in the deposition transcript.").

Second Foster Decl. at ¶ 23, ECF 61. Additionally, Mr. Burket included with his declaration corrections a statement of his reasons for the changes and clarifications. Second Foster Decl., Ex. 22 at ¶ 2, ECF 61-5 at 69. In his statement, Mr. Burket specifically explains the reason for each correction. *Id.* at ¶¶ 3-8.

Moreover, Mr. Burket's changes are "corrective, and not contradictory, changes." *See Hambleton*, 397 F.3d at 1226. Mr. Burket made six statements of clarification, none of which are contradictory or inconsistent with Mr. Burket's deposition testimony: (1) Mr. Burket clarified that when he used the term "legal restrictions," he was referring to "usage restrictions imposed by outside third parties and the law"; (2) Mr. Burket clarified that when he used the term "formal restrictions," he was also referring to "usage restrictions imposed by outside third parties and the law"; (3) Mr. Burket explained that when he said "one-twelfth of the amount under the rent rebate agreement," he meant "one-twelfth of the maximum total rent payments allowed under the agreement"; (4) Mr. Burket clarified that he used the terms "tracking fund," "management fund," "informal management fund," and "financial management fund" interchangeably during the deposition, and that he believed the clearest term was "financial management fund"; (5) Mr. Burket expanded on his explanation of the LGIP Account, clarifying that the monthly ending balance of that account is not an indicator of property tax spending; and (6) Mr. Burket clarified that the Rent Programs and the Carrier Programs were funded by the T6 Fund. Burket Errata at ¶¶ 3-8, ECF 61-1 at 37-40.

None of these changes are "clear[ly] and unambiguous[ly]" inconsistent with Mr. Burket's deposition. *See Yeager*, 693 F.3d at 1080. Because Mr. Burket's corrections were submitted only four days late and because the changes were "corrective, and not contradictory," the Court denies ILWU's motion to strike Mr. Burket's clarification declaration (ECF 48).

PAGE 14 – OPINION AND ORDER

## 2. Objection to the Port's 2012-2013 Financial Audit Report

ILWU argues that the Port submitted its *Report on Audit of Financial Statements and Supplemental Information* for the Port's fiscal year ending on June 30, 2013, after the close of discovery. *See* Burket Decl. Ex. 4, ECF 58-2. The Port responds that the recently published audited financial statements are a matter of public record, and they first became available at the time the Port filed its response. The Port argues that the most recent audit could not have been presented to ILWU any earlier because it was not finalized by the Commission. The Port also argues that during discovery, it referred ILWU to the Port's website for downloading various Port financial and budgetary documents. The disclosure of the recently published audited financial statements, according to the Port, is entirely consistent with the discovery practice in this case between the parties. As a final matter, the Port argues that ILWU fails to demonstrate any unfair prejudice that it has suffered by the recent disclosure of the Port's audited financial statements.

Pursuant to Federal Rule of Civil Procedure 56(c)(1)(A), the Port is entitled to support its motion by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." A court is free to consider "any material that would be admissible or usable at trial." 10A C. Wright, A. Miller, et al., 10A *Fed. Prac. & Proc. Civ.* § 2721 (3d ed.) (explaining that a court "will consider all papers of record" before granting summary judgment; Fed. R. Civ. P. 56(c)(2). The Port may supplement recently finalized audited financial statements for the relevant time periods, particularly because they were properly and promptly disclosed after they became available, and thus they would not be excluded at trial. *See* Fed. R. Civ. P. 26(e) (requiring a party to supplement or correct disclosures under Rule 26(a) "in a timely manner if the party learns that in

some material respect the disclosure or response is incomplete or incorrect"); Fed. R. Civ.

P. 37(c)(1) (forbidding the use at trial of information required to be disclosed by Rule 26(a) that

was not properly disclosed); *see also R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1246-47

(9th Cir. 2012) (excluding evidence because the party failed to supplement its disclosures as

required under Rule 26(e)).

Moreover, ILWU fails to articulate any way in which it has suffered unfair prejudice. The

Court has granted the parties several briefing extensions, and the Court would have granted

ILWU more time to analyze the audited financial statements if such a request had been made.

Further, the Port disclosed the source of the audited financial statements to ILWU during

discovery, the financial statements are a matter of public record, and they can be downloaded

from the Port's website.

The Court overrules ILWU's evidentiary objection to the *Report on Audit of Financial*

*Statements and Supplemental Information* for the Port's fiscal year ending on June 30, 2013.

## B.  Cross-Motions for Summary Judgment

ILWU and Defendants cross-move for summary judgment on ILWU's second claim for

relief, which alleges a violation of Article XI, § 9 of the Oregon Constitution.

### 1.  Article XI, § 9 of the Oregon Constitution

Article XI, § 9 of the Oregon Constitution provides in relevant part: "No county, city,

town or other municipal corporation, by vote of its citizens, or otherwise, shall become a

stockholder in any joint company, corporation or association, whatever, or raise money for, or

loan its credit to, or in aid of, any such company, corporation or association." Or. Const., Art. XI,

§ 9. The Oregon Supreme Court interprets Article XI, § 9 "to prevent the investment of public

funds in private enterprises." *Johnson v. Sch. Dist. No. 1*, 128 Or. 9, 12 (1928); *see also*

*Carruthers v. Port of Astoria*, 249 Or. 329, 331 (1968) ("Since the start of the 20th Century, it

has been settled that public funds cannot be expended for other than a public purpose."). The only public funds, however, that are protected under Article XI, § 9 are "tax revenues." *DeFazio v. Wash. Pub. Power Supply Sys.*, 296 Or. 550, 579 (1984).

Article XI, § 9 "was designed to curb speculation, which in many instances resulted in pecuniary loss to the taxpayer." *Johnson*, 128 Or. at 12; *see also Mun. Sec. Co. v. Baker Cnty.*, 39 Or. 396, 406 (1901) (stating that Article XI, § 9 was enacted to prevent local governments from "mortgag[ing] the future to advance the interests of the present"). Public "commitments or expenditures which incidentally benefit private entities do not violate Art. XI, § 9, unless they entail ultimate recourse against general tax revenues or do not serve a 'public purpose.'" *Nicoll v. City of Eugene*, 52 Or. App. 379, 383, *adhered to as mod. on reconsideration*, 53 Or. App. 528 (1981) (citing *Carruthers*, 249 Or. at 331). "When government engages in public services or activities that generate revenues other than taxes, this court's past decisions have let government commit those revenues to financing its own projects or to support desired private projects[.]" *DeFazio*, 296 Or. at 579. For example, in *Miles v. City of Eugene*, the Oregon Supreme Court found that Article XI, § 9 "does not prohibit a city from using funds raised from revenue bonds to acquire and operate a nuclear power plant jointly with a private utility." 252 Or. 528, 537 (1969).

### 2.  Overview of the Parties' Arguments

ILWU alleges that the Port violated Article XI, § 9 of the Oregon Constitution by using public tax dollars to finance the Programs. The Port argues that it is entitled to summary judgment for two alternative reasons. First, even if property tax revenues were used to finance the Programs, which the Port denies, the Port maintains that Article XI, § 9 of the Oregon Constitution only prohibits the Port from prospectively "raising money for" or "lending its credit to" a private entity, which it has not done. Second, the Port's accounting, budgeting, and fiscal

management systems conclusively demonstrate that property tax revenues have not in fact been used to finance the Programs.[5] ILWU argues that the Port necessarily spent tax revenues on the Programs because, first, the General Fund, which is used to fund the Programs, contains comingled assets; and second, the Port lacked sufficient operating income after depreciation to fund the Programs with non-tax revenues. For these reasons, ILWU argues, the Port's motion for summary judgment should be denied and ILWU's motion for summary judgment should be granted.

The parties' cross-motions for summary judgment and supporting arguments distill down to a question of how the Port's financial management systems and policies function and whether the Port's records conclusively demonstrate that tax revenues have not been spent on the Programs. The Court begins its analysis with the parties' evidence and arguments related to the Port's management of tax and non-tax revenues.

### 3.  The Port's Evidence and Arguments

The Port makes two alternative arguments in favor of summary judgment. The first relates to the Port's Bond Construction Fund. The second relates to the Port's internal financial tracking systems and the creation of the T6 Fund.

### a.  The Bond Construction Fund

The Port argues that the Court should grant summary judgment against ILWU's claim under Article XI, § 9 because the Port's Bond Construction Fund establishes that the Port did not use tax revenues to fund the Programs. The Bond Construction Fund is used for construction and improvement of new and existing facilities and structures. Second Burket Decl. Ex. 5 (2013-14 Approved Budget), ECF 58-3 at 75. By assigning all property tax revenues to the Bond

---

[5] Because the Port's second argument is meritorious, the Court does not address the Port's first argument, which interprets Article XI, § 9 to apply only prospectively.

Construction Fund, the Port argues, it ensures that property taxes do not fund the Programs. ILWU argues that property tax revenues are not properly segregated because assigning all property tax revenues into the Bond Construction Fund merely creates a different "landing point" for the funds, which can be transferred freely into the General Fund.

Because the Port is the moving party but does not carry the burden of proof at trial, it need only prove that "there is an absence of evidence to support the non-moving party's case." *See In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387. The Port argues that because all tax revenues are assigned to the Bond Construction Fund, which does not fund the Programs, ILWU cannot prove a violation of Article XI, § 9.

The Port's budgeting process shows that after July 1, 2012, the Port allocated all tax revenues to the Bond Construction Fund. The Port's Budget includes operating funds, construction funds, and debt service funds. *See* Second Burket Decl. Ex. 5 (2013-14 Adopted Budget), ECF 58-3 at 25. The General Fund is an operating fund and the Bond Construction Fund is a construction fund. Specifically, the Bond Construction Fund is used for "acquisition, construction, expansion, and improvement of new and existing structures and facilities." Second Burket Decl. Ex. 5 (2013-14 Approved Budget), ECF 58-3 at 69.

In November 2012, the Port adjusted its 2012-13 budget, assigning all property tax revenues to the Bond Construction Fund. Second Foster Decl. Ex. 15 (Appropriation Adjustment), Ex. 20 (Appropriation Adjustment Slides), ECF 61-4, 61-5. The Port applied this change retroactively so that beginning July 1, 2012 all tax revenues would be transferred to the Bond Construction Fund. *Id.*; Burket Dep. at 99:15-101:21, ECF 61-1 at 26. The decision also has been applied to all subsequent budgets, including the current budget. *Id.* The Port made this

change to segregate the property tax revenues and ensure that they were used only for "debt service and capital construction." Wyatt Dep. at 72:9-25, ECF 61-1 at 74.

The Bond Construction Fund is reported not only in the budgeting process, but also in the Port's accounting system and financial statements. Second Burket Decl. Ex. 4 (2012-13 Audited Financial Statements), ECF 58-2. In the Port's accounting system, collected property taxes are now recorded into the designator "Company 150," which is the accounting system's designation for the Bond Construction Fund. Burket Dep. at 29:1-18, ECF 61-1 at 13; Second Burket Decl. Ex. 4 (2012-13 Audited Financial Statements), ECF 58-2 at 48. In the Port's financial statements, property tax revenues are treated as non-operating revenue and recorded within the Bond Construction Fund, whereas the annual rent received from ICTSI is treated as operating revenue and recorded within the General Fund.[6] Burket Dep. at 33:8-35:23, ECF 61-1 at 14.

The Port argues that by using its accounting and budgeting systems, the Port can "more transparently segregate, track, manage, and publicly report on its property tax revenues." Defs.' Resp., ECF 57 at 29. Moreover, the Port asserts, these systems demonstrate that no monies from the Bond Construction Fund were used to pay for the Programs, and therefore no property taxes were used to pay for the Programs.

ILWU's responds that in a Rule 30(b)(6) deposition, the Port's Controller, Mr. Burket, explained that the November 2012 change in appropriations for the tax revenues had no effect on whether or not property taxes were eventually transferred to the General Fund. Mr. Burket testified:

---

[6] Under an automatic accounting procedure used in 2012, the Port booked tax revenues in the General Fund and then immediately transferred the revenues to the Bond Construction Fund. Starting in May 2013, the Port ceased using this automatic procedure and now directly deposits tax revenues into the Bond Construction Fund. Second Burket Decl. Ex. 4 (2013 Audited Financial Statements), ECF 58-2 at 46-48.

The—moving the property taxes to record the revenue in the bond construction fund versus the—the General Fund essentially changes the landing point on the books where that goes to. Regardless of which one—which fund it goes into, we then have to do an allocation, because the debt service is paid in the General Fund, the capital is paid in the [B]ond [C]onstruction [F]und. So depending on what that allocation that the financial analysis and projects folks do in the—in the [C]overage [F]und, they determine what that split is, so one way or another we have to make a transfer, either under the old system where it was recorded in the General Fund, we had to transfer the capital piece over to Company 150 [Bond Construction Fund], or now what we do is we calculate the debt service piece and we can transfer that out of 150 [Bond Construction Fund] over into 100 [General Fund]. So we're still doing a transfer and we're still paying for both types of costs, we've just changed that landing point, essentially.

Burket Dep. at 102:3-20, ECF 61-1 at 27. ILWU argues that the Port is bound by this testimony and that it shows that tax revenues sometime move into the General Fund and, therefore, could potentially be used to fund the Programs.

ILWU's argument is unavailing. Mr. Burket's deposition only speaks to the fact that sometimes money from the Bond Construction Fund is used to service debt—a permitted use of tax revenues—not that tax revenues are used to fund the Programs. Mr. Burket testified that the process through which money would be transferred from the Bond Construction Fund to the General Fund to service debt is called an "interfund reimbursement." Burket Dep. at 103:2-3, ECF 61-1 at 27. If money from the General Fund is used for servicing debt, the Port will "reimburse" the General Fund with money from the Bond Construction Fund. The fact that Bond Construction Fund money is sometimes transferred to the General Fund to service Port debt does not create an issue of fact regarding whether the Port used tax revenues to fund the Programs. Therefore, Mr. Burket's testimony does not raise more than a "metaphysical doubt" as to the material facts at issue. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586. As in *Carruthers*, the Bond Construction Fund is a restriction that guards against the "taxpayers or other property" of

the Port being held "generally accountable in taxes." 249 Or. at 339. The operation of the Bond

Construction Fund demonstrates that tax revenues were not used to finance the Programs.

### b.  Internal Financial Tracking and the T6 Fund

The Port's second, and alternative, argument is that it is entitled to summary judgment on

ILWU's claim under Article XI, § 9 because the Port uses an internal tracking system that

demonstrates that ICTSI payments to the Port are sufficient to finance the Programs without

using tax revenues. This practice, the Port argues, segregates tax revenues into its "Coverage

Fund" and revenues and expenditures for the Programs into its "T6 Fund." Foster Decl. Ex. 7,

ECF 61-2 at 3. ILWU responds that the Port's T6 Fund does not represent a source of funding

for the Programs that is separate from property tax revenues and cites to the Hill Report.

The first tracking "bucket" the Port relies on is its Coverage Fund, which isolates, tracks,

and manages property tax revenues. Second Foster Decl. Ex. 7, ECF 61-2 at 3; Schultz Decl.,

ECF 59 at 3 ¶¶ 5-6. As explained by Mr. Wyatt, these funds are a management tool that helps the

Port implement its policy direction, and "ICTSI revenues fall within one of those, as property

taxes fall in another." Wyatt Dep. at 33:9-14, ECF 61-1 at 67.

The Coverage Fund receives its funding from property taxes and, from the Navigation

operating unit, operating income before depreciation is deducted ("OIBD"). Second Foster Decl.

Ex. 7, ECF 61-2 at 3. Revenues in the Coverage Fund are dedicated to debt service, capital

leases, investment return deficits not achieved in the Investment Fund, and capital investments

that cannot earn a financial return (*i.e.*, asset maintenance). Second Foster Decl. Ex. 7, ECF 61-2

at 3; Burket Dep. at 87:8-11, ECF 61-1 at 23 (explaining that "property taxes . . . would only be

able to be used for capital or for debt service payments" and would not "go to pay for []

operating expenditures"); Schultz Dep. at 31:1-32:20, ECF 61-1 at 45. Mr. Schultz testified in

deposition, in response to the question of whether the working capital guideline policy is one that

PAGE 22 – OPINION AND ORDER

the Port is required to follow: "I'm not sure what you mean by that. I mean, yeah, the policy

establishes how we dictate and report . . . and that's how we manage and track those funds. So, in

essence, yes, I guess it would." Schultz Dep. at 32:17-20, ECF 61-1 at 45. The Port maintains

that although the Coverage Fund can fund capital expenditures, it has not been used to fund

capital expenditures associated with the T6 Fund. *Id.* at 141:3-151:10, ECF 61-1 at 56-58;

Second Foster Decl. Ex. 6, ECF 61-2 at 2 ("General Fund Bucket Forecast").

      The second tracking fund used by the Port is the T6 Fund, which isolates, tracks, and

manages revenues received from ICTSI related to the Lease Agreement. Schultz Decl., ECF 59

at 3 ¶ 5; Second Foster Decl. Ex. 6, ECF 61-2 at 2. The General Fund Bucket Forecast best

demonstrates the allocation of revenue and expenditures through the Port's internal management

tracking system. Second Foster Decl. Ex. 6, ECF 61-2 at 2. The Port assigned the initial Lease

Agreement closing payment and all subsequent payments from ICTSI to the T6 Fund. Schultz

Decl., ECF 59 at 3 ¶ 5; Second Foster Decl. Ex. 6, ECF 61-2 at 2. The Port budgeted for its

expenditures under the Programs to come from the T6 Fund. Schultz Decl., ECF 59 at 3 ¶ 5

("Expenses assigned to the T6 Fund are also reflected and include payments to ICTSI and calling

[C]arriers under the Port's 2012 and 2013 Programs."); Second Foster Decl. Ex. 6, ECF 61-2

at 2. Thus, the T6 Fund "[r]epresents the revenue and expenses associated with [the] ICTSI

lease." Schultz Dep. at 38:1-2, ECF 61-1 at 47. A payment analysis of allocated revenue and

expenditures for the Programs from August 2010 through October 2013 corroborates

Mr. Schultz's explanation. Schultz Decl., ECF 59 at 7-11. The Port asserts that it has not

included any property tax revenues in the T6 Fund.

      Moreover, the deposition testimony and subsequent declaration of Mr. Burket, the

Controller of the Port of Portland, are consistent with Mr. Schultz's explanation of the Port's

accounting methodologies. In his deposition, Mr. Burket stated that funds from the LGIP

Account are transferred to the Port's General Fund, which is in a single account held at Wells

Fargo. Burket Dep. at 48:5-49:1, ECF 51-3 at 26-27. He further explained that when a "bill is

paid on the account—in the accounting system, a record is generated that designates where that

dollar came from." *Id.* at 48:19-25, ECF 51-3 at 26. Mr. Burket described how expenditures on

the Programs were "recorded separately and are reportable on within [*sic*] the Port's General

Fund." *Id.* at 37:9-17, ECF 51-3 at 18. Later in his deposition, Mr. Burket explained how

separate tracking funds are used by the Port, noting that "in addition to [the Port's] formal

accounting funds, there are financial management funds, lower case f, which are utilized to

further manage and segregate the monies within those—and tracking—they're tracking funds

essentially." *Id.* at 50:17-21, ECF 51-3 at 28. These financial management funds (or tracking

funds) are "any pot of money that the Port decides it wants to track the use of separately." *Id.*

at 51:7-9, ECF 51-3 at 29. These "internal management decisions would not generally show up

in the Port's accounting system as a formal restriction on a financial statement." *Id.* at 51:25-

52:3, ECF 51-3 at 29-30.

With regard to tax revenues specifically, Mr. Burket testified that tax dollars are similarly

tracked using internal processes and procedures. He stated that:

> [T]he financial analysis and projects group keeps track of the
> particular projects and how much of them are funded with property
> tax dollars. . . . On the accounting side, we do keep track of the
> property taxes coming in, their deposits that come into the LGIP
> and their statements, so you can go through and you can track
> individual deposits, reconcile that at the end of the year to the
> reporting that we get from the various counties that recap the
> property tax deposits, which levies they're related to, and write
> offs there might have been, and a host of other little adjustments.
> So we—*we can essentially account for every property tax dollar
> coming in*. And then the financial analysis and projects group take

> that property tax amount, put it into their—the coverage fund
> tracking where they apply the rules, whether it's based on
> guidelines, Port policies or—or any other, you know, internal
> management restrictions and decisions, and they use that
> framework to allocate the property tax dollars to the specific
> projects.

*Id.* at 88:24-89:18, ECF 51-3 at 38-39 (emphasis added).

Mr. Burket reiterated that separate from the externally imposed legal and accounting practices the Port follows, there are "internal management controls and policies regarding the segregating, tracking, management [and] application of rent or other monies received from [ICTSI] or any other Port revenues within the General Fund." Burket Decl., ECF 58 at 3 ¶ 6. Mr. Burket also clarified that when using the terms "tracking fund," "management fund," "information management fund," and "financial management fund" he is referring to the same fiscal management mechanism and policy in place at the Port. *Id.* at 4 ¶ 8.

The Port's Directors approved the T6 Fund in December 2009 in "anticipation of the Port leasing out the T6 container terminal" and designed the T6 Fund to "pay for the capital requirements under the lease." Second Foster Decl. Ex. 18, ECF 61-5 at 57. On April 26, 2010, Mr. Schultz sent the "first pass" of the T6 Fund Proposal to Sugie Joseph at the Port. *Id.* at 55-56. As originally designed, the total potential revenue under the lease agreement would be $238,576,533. *Id.* at 58. The Port planned to put 40 percent of its annual rent into the Investment Fund so that the revenue under the Lease Agreement could produce other revenue generating projects or assets. *Id.* at 57. Thus, the Port forecasted $108,560,562 in revenue into the T6 Fund as a result of the Lease Agreement. *Id.* at 58. The total capital requirements the Port forecasted under the agreement amounted to $104,962,774, which would yield a net-positive balance in the T6 Fund of $3,597,787. *Id.* In a Marine Industrial Development ("MID") Memo prepared by Mr. Sam Ruda on June 17, 2010, there was full agreement among the MID staff to create the T6

Fund specific to the Port's lease obligations and, from the outset, to allocate ICTSI's $8 million closing payment to the T6 Fund. Second Foster Decl. Ex. 19, ECF 61-5 at 61. Beyond that agreement, the Port did not adopt the remaining portions of Mr. Schultz's proposal. After Mr. Ruda's memorandum, it appears that the Port made "no decision . . . in terms of allocating any portion of [the Lease Revenue] to different funds," and because the Port "needed to house it somewhere . . . it ended up being in the T6 Fund." Schultz Dep. at 142:13-16, ECF 61-1 at 56. The Port consistently allocated all revenues received under the Lease Agreement to the T6 Fund. Second Foster Decl. Ex. 6, ECF 61-2 at 2; Schultz Dep. at 151:7-10, ECF 61-1 at 58 ("[A] decision has been made, we are including [ICTSI rent payments] in the T6 fund. That could change in the future, but for now all the revenue is being reflected in there.").

As evidence that the Port adheres to the fiscal management practices described above, the Port provided "bucket reports" relied on by Port management officials. Schultz Decl., ECF 59 at 2 ¶¶ 3-4. The Port argues that in addition to the evidence related to the planning for the T6 Fund and the internal financial management reports reflecting actual treatment of the fund, these regular "bucket reports" are an "additional assurance that the Port's tax revenues are spent consistently with Port policy." Defs.' Resp., ECF 57 at 25. Mr. Schultz describes these reports in his deposition testimony, stating: "[t]he whole reason for the bucket report was to make sure we had visibility to what we were funding with what source of revenue." Schultz Dep. at 150:17-19, ECF 61-1 at 58.

ILWU relies on the Hill Report as its primary basis to attempt to show a genuine issue for trial and to refute the Port's motion for summary judgment. *See In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387. Within the Hill Report, ILWU argues that the following issues demonstrate that property tax funds were or could be used to finance the Programs: (1) the T6 Fund does not exist

in the Port's audited financial statements; (2) the T6 Fund is not subject to written guidelines; (3) the T6 Fund was intended to fund capital expenditures; (4) the mechanics of the T6 Fund have been inconsistent; (5) the T6 Fund does not represent monies segregated from property taxes because the initial deposit included the sale of rolling stock to ICTSI that may have been originally paid for by property tax dollars; and (6) the T6 Fund does not represent revenues available to the Port to finance the Programs and instead is only an indication of cash flow. Hill Report, ECF 51-1 at 26-36.

Beginning with the first opinion in the Hill Report, that the T6 Fund does not appear in audited financial statements, ILWU fails to explain why Article XI, § 9 of the Oregon Constitution would impose such a requirement. The Port is simply obligated to demonstrate that revenues other than taxes were used to finance the private project. *See DeFazio*, 296 Or. at 579. Although externally audited financial statements that demonstrate the separate management of Lease Agreement revenues and funding for the Programs might provide the Port with stronger protection, there is nothing inherently inappropriate, let alone unconstitutional, with the Port's use of an internal financial management system. Speculating that the lack of audited financials might permit the Port to engage in nefarious and unconstitutional practices (which is not currently supported by any evidence submitted by ILWU) amounts to nothing more than a "metaphysical doubt" as to a material fact at issue. *See Matsushita*, 475 U.S. at 586.

Next, the assertion in the Hill Report that there should be written guidelines about the management of funds fails to rebut the evidence presented by the Port that it has consistently segregated property tax revenues and the operation of the Programs. Second Foster Decl. Ex. 6, ECF 61-2 at 2. ILWU argues that the Port Director's 2009 approval of the T6 Fund and General Fund management strategy is insufficient to show that the T6 Fund was "formally" approved.

Hill Report, ECF 51-1 at 30. Yet, ILWU does not explain who would have been required to approve the fund beyond the Port's Directors. ILWU relies on the internal memoranda from Mr. Schultz and Mr. Ruda to argue that the General Fund finance strategy is a moving target. Both memoranda agree, however, that the Port should create the T6 Fund, but they did not commit the Port to any particular financial management plan. Further, the Port's practice after the T6 Fund's creation has been to segregate revenues under the Lease Agreement to the T6 Fund and attribute expenses under the Programs to the T6 Fund. Second Foster Decl. Ex. 6, ECF 61-2 at 2. ILWU has no evidence to the contrary.

ILWU's third argument is that the Programs prevent the Port from funding future capital expenditures. Mr. Schultz's memorandum regarding the "proposed addition to the General Fund (GF)" outlined what he anticipated to be potential capital expenditures over the term of the Lease Agreement. Second Foster Decl. Ex. 18, ECF 61-5 at 57. Mr. Ruda's MID Memo, however, explained that the Port "should not assume that the Port is on the hook for the cost of new cranes in full or that the revenue stream associated with the lease remains static." Second Foster Decl. Ex. 19, ECF 61-5 at 62. Further, future long-term capital cost projects could also be "supported with grants (state, federal etc.)." *Id.* This exchange shows that, at most, the Port did not decide on what its long-term capital expenditures would be under the Lease Agreement. There is no evidence that the Port adopted either Mr. Schultz's or Mr. Ruda's proposed strategies for the T6 Fund. ILWU has also failed to show that the Port has anticipated capital expenditures that it will be unable to cover with rent revenue under the Lease Agreement beyond the speculative costs noted in Mr. Schultz's proposal. This evidence does not negate the Port's documented practice of keeping property tax revenues segregated in the Coverage Fund and thus does not create a factual dispute to be resolved at trial. *See In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387.

ILWU's fourth argument that the mechanics of the T6 Fund have been inconsistent is also without merit. The Hill Report again relies on the proposal created by Mr. Schultz, which suggested placing 40 percent of the Lease Agreement revenues into the Investment Fund rather than solely in the T6 Fund or into some other "bucket." Second Foster Decl. Ex. 18, ECF 61-5 at 57. Before implementing the Programs at issue in this lawsuit, the Hill Report notes that there was no indication that the T6 Fund was being used for anything other than capital obligations. Hill Report, ECF 51-1 at 32.

There is no evidence, however, showing that the Port was in any way prohibited from making the internal budgetary decisions it did after the initiation of the labor dispute that prompted the Programs. Without such evidence, ILWU fails to show there are factual disputes that require resolution by a jury. *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law . . . it cannot support a jury's verdict."); *see also In re Silberkraus*, 336 F.3d 864, 871 (9th Cir. 2003) (discounting expert testimony that fails to cite authority or supporting facts).

ILWU's fifth theory is that the initial deposit into the T6 Fund of $8 million was from the sale of rolling stock to ICTSI that the Port originally financed with property taxes. Hill Report, ECF 51-1 at 33-34. The Hill Report also notes that the Port's *Managing the General Fund's Working Capital* document provides that the Coverage Fund (which includes property taxes) would be used to make up a shortfall if the T6 Fund ever had a negative OIBD. The Port responds that the Hill Report cites "no legal obligation of the Port to dedicate this $8 million to pay for some specific expenditure or to apply against some Port accounting entry." Defs.' Resp., ECF 57 at 24 n.16. ILWU maintains that by using the sale of assets that may have been

purchased with tax dollars, the Port has given away tax dollars to a private company. Pl.'s Reply, ECF 64 at 16. The Court is not persuaded by this argument because the Port has demonstrated that it has received funds from the annual rent payments from ICTSI, even apart from the initial $8 million payment, that are in excess of the total costs of the Programs. *See* Schultz Decl., ECF 59 at 4 ¶¶ 7-10. The Court also does not read Article XI, § 9 to prohibit the existence of a speculative risk that the Coverage Fund might someday be improperly used to finance the Programs. Moreover, the record evidence shows that the T6 Fund and Marine Division have not had a negative OIBD during the relevant time period, and the Port does not use the Coverage Fund to finance Lease Agreement capital expenditures. *See infra* Section B.4.b.; Second Foster Decl. Ex. 10, ECF 61-2 at 76.

ILWU's sixth argument on this topic is that the T6 Fund is the wrong measurement to assess whether the Port can finance the Programs because it represents cash flow rather than revenue, expenses, and operating income. Hill Report, ECF 51-1 at 31-37. The only direction this Court has from the Oregon Supreme Court on this issue is a government or governmental unit may use non-tax "revenues to financ[e] its own projects or to support desired private projects[.]" *DeFazio*, 296 Or. at 579. For example, in *Miles*, the Oregon Supreme Court found that a city was not prohibited from "using funds raised from revenue bonds to acquire and operate a nuclear power plant jointly with a private utility." 252 Or. at 537. Neither case indicate that a local government is required to demonstrate that it had net operating income from an account that was in no way comingled with tax revenues to finance such projects. The Port's analysis of its cash flow from the Programs reflects a net-positive balance that can fund the Programs. *See* Second Foster Decl. Ex. 6, ECF 61-2 at 2. Even assuming that the $8 million initial payment cannot provide funding for the Programs, the Port has provided unrefuted

evidence that it has received sufficient revenues under the Lease Agreement, even without considering the initial payment, to finance the Programs. *See* Schultz Decl., ECF 59 at 4 ¶¶ 7-10. ILWU also raises the argument that the Court should look to the Port's operating income after depreciation. As noted above, *see infra* Section B.4.b., the Port has provided sufficient evidence to explain why depreciation should be treated as a non-cash expenditure and does not affect its OIBD. The Hill Report provides no facts or evidence beyond a conclusory assertion, and ILWU provides no legal authority, that depreciation must be considered. This is not enough to create a genuine dispute as to a material fact. *See Matsushita*, 475 U.S. at 587.

In sum, the Court finds that the Port has provided sufficient evidence conclusively to demonstrate that it has not violated Article XI, § 9 because: (1) the Port's Coverage Fund segregates and allocates all property tax revenues; and (2) all revenues from the Lease Agreement were assigned to the T6 Fund and all the Programs' costs were deducted from the T6 Fund. Viewing the evidence in the light most favorable to the non-moving party, ILWU, the Court concludes that there are no genuine disputes as to any material fact.

### c. Conclusion

The Port's Bond Construction Fund and internal financial tracking systems, specifically the T6 Fund and the Coverage Fund, conclusively establish that the Port isolated, tracked, and managed its tax revenues so that they were not used to fund the Programs.

### 4. ILWU's Other Arguments

ILWU makes two additional arguments both to rebut the Port's motion and to show that ILWU is entitled to summary judgment. First, ILWU argues that the Port's comingling of funds in the General Fund has necessarily led to the Port using tax revenues on the Programs. Second, ILWU argues that the Port's negative operating income after deducting depreciation demonstrates that the Port must have financed the Programs with tax revenues.

### a. Comingled Assets in the General Fund

ILWU argues that summary judgment should be granted in favor of ILWU on its claim under Article XI, § 9 because it is undisputed that the Port's property tax revenues are "comingled" with non-tax revenues, including receipts under the Lease Agreement, in the Port's General Fund. ILWU contends that this comingling means that "the Port necessarily has drawn, will draw, or could draw on its property tax revenues to fund the Programs." Pl.'s Reply, ECF 64 at 5. Defendants do not deny comingling. Hence, this fact is undisputed. Defendants, however, respond that there is no requirement under Article XI, § 9 that tax revenues not be comingled with other assets so long as they are tracked and accounted for separately and not used for any improper purpose.

Article XI, § 9, and the cases interpreting this section of the Oregon Constitution, provide relatively sparse guidance. ILWU cites to the decision by the Oregon Court of Appeals in *Lane County v. Paulus* for the proposition that after assets are comingled, it becomes "impossible to determine" the source of any particular dollar spent. *See Lane Cnty. v. Paulus*, 57 Or. App. 297, 301 n.4 (1982) (quoting *House Committee on Local Government*, April 3, 1963). In that case, the court held that interest from road funds and federal forest funds could not be credited to a county general fund if the fund moneys were comingled with moneys from invested funds. *Id.* at 301-02. Instead, the court ruled that interest must be credited to the special funds generating the interest. *Id.*

The *Paulus* decision, however, is distinguishable from this lawsuit. In *Paulus*, the court was interpreting a disputed term found in Or. Rev. Stat. § 294.080(1), which regulates the treatment of interest earned on funds held by a county treasurer. The footnote cited by ILWU relates to the legislative history of that Oregon statute, which is not at issue in this case. *See Paulus*, 57 Or. at 301 n.4. Moreover, the issue addressed in the cited legislative history only

PAGE 32 – OPINION AND ORDER

shows the difficulty in calculating *interest revenue* for comingled assets in a single account, not the inability to segregate funds deposited into a single account through internal accounting procedures. In short, *Paulus* did not address or interpret Article XI, § 9, and ILWU fails to provide a persuasive reason to import the reasoning from that case of statutory interpretation to this case involving Article XI, § 9 of the Oregon Constitution.

ILWU's accounting expert, Vanessa J. Hill, opines that the comingling of funds indicates that property taxes must have been used by the Port to subsidize the cost of the Programs. Hill Report, ECF 51-1 at 16. The parties agree that the Port's main cash account (the General Fund) contains both tax and non-tax revenues, although the precise amount of each depends on whether contributions are analyzed in terms of: (1) the percentage of property taxes to total revenues (yielding 14 percent of funds from property taxes); or (2) the percentage of net cash sources to the General Fund (yielding roughly between two and six percent of funds from property taxes). *Id.* at 16, 18. The Hill Report explains that the State of Oregon receives property taxes on the Port's behalf that are placed into the LGIP Account. From the LGIP Account, the Port transfers funds into its General Fund. The Hill Report asserts that because the Port comingles tax and non-tax revenues in the General Fund, tax revenues must be used, at least in part, to fund the Programs. That conclusion, however, does not follow.

ILWU's comingled asset theory appears to be based on an extrapolation from dictum from the Court's previous ruling permitting discovery under Federal Rule of Civil Procedure 56(d) on this motion. *See Int'l Longshore & Warehouse Union v. Port of Portland*, 2013 WL 1412882, at *9 (D. Or. Apr. 8, 2013) ("If either or both of the Programs did, will, or could draw on the Port's tax revenues, ILWU might have a valid claim under Article XI, § 9."). As explained above, it is well settled under Oregon law that "[w]hen government engages in

public services or activities that generate revenues other than taxes, . . . government [may] commit those revenues to financing its own projects or to support desired private projects[.]" *DeFazio*, 296 Or. at 579. The mere co-existence, or comingling, of two funding sources in one bank account, however, is not *prima facie* evidence of a violation of Article XI, § 9 of the Oregon Constitution. Further, even if the funding sources were in separate bank accounts, a bank would not "physically" segregate the funds into separate sacks of money, but instead, would credit payments to a particular account. In that sense, the Port's accounting procedures and financial management structures when used consistently by the Port are no less reliable than maintaining separate bank accounts. In other words, the Hill Report and ILWU's arguments rest upon a *non sequitur*.

The evidence presented by the Port, *see supra* Section B.3.a.-b., conclusively demonstrates that the Port's financial management practices and systems separately account for the Port's tax and non-tax revenues. ILWU offers no probative evidence to the contrary. Thus, the Port's unrefuted evidence rebuts ILWU's argument that the mere existence of comingled revenues in the General Fund proves a violation of Article XI, § 9.

### b. The Port's Operating Income

ILWU also argues that summary judgment in its favor is appropriate because the Port's operating income is insufficient to offset its operating expenses (including depreciation) and that this deficit necessarily means that the Port must have used other General Fund monies, including property taxes, to fund the Programs. Pl.'s Mem., ECF 50 at 17. The Port responds that the Marine Division, the source of funding for the Programs, has sufficient net operating cash to fund the Programs without borrowing from the Port's tax revenues. The Port adds that even if there were insufficient net operating revenues to cover actual operating expenses (which includes non-cash expenses for accounting purposes, such as depreciation), the Port's fiscal management

PAGE 34 – OPINION AND ORDER

systems conclusively demonstrate that tax revenues were not used to pay for the Programs. Defs.' Resp., ECF 57 at 30-31. The primary dispute is whether the Port's Marine Division has sufficient operating income to fund the Programs.

ILWU contends that the three relevant levels of business operations in question all lack sufficient operating income to fund the Programs. Those three operations, from broadest to most narrow, are: (1) the Marine Division; (2) the Container Business Line; and (3) the T6 Business Unit. Pl.'s Mem., ECF 50 at 17. The Port responds that the critical fact to examine is the Port's operating income *before depreciation* expenses are deducted, OIBD, rather than looking at operating income *after* depreciation and other non-cash expenses have been deducted.

ILWU offers the Hill Report, which argues that it is necessary to deduct all costs, including depreciation, in order to arrive at the Port's actual operating profits. Hill Report, ECF 51-1 at 24 ¶ 16. According to the Hill Report, "the principal evidence to be examined includes the operating income statements produced by the Port during discovery." *Id.* at 25 ¶ 18. The Hill Report asserts that the operating income statements are the most important indicator of the Port's ability to pay because operating income statements "measure whether the proprietary fund is economically better off as a result of the events and transactions that have occurred during the fiscal period reported." *Id.* (citation and quotation marks omitted). The Hill Report concludes that "the operating income statement reflects whether the Port made a profit and a net profit is needed in order to have a source to fund the Programs." *Id.*

Exhibits 3 through 6 of the Hill Report summarize the Marine Division's operating revenues, operating expenses, and operating losses for the years 2010 through 2013. *Id.* at 48. There also are summaries for the Container Business Line, a subdivision of the Marine Division, and for ICTSI Lease Agreement business units, tracking the revenues, operating expenses, and

operating losses from 2011 through 2013. *Id.* at 49-50. For each type of business operation summarized, the Hill Report concludes that there were operating losses. *Id.* at 48-50. None of these summaries, however, differentiate between types of operating expenses, such as non-cash expenses like depreciation, in the Marine Division. *Id.*

The Port responds that ILWU's approach to analyzing the Port's ability to finance the Programs is incorrect. The Port relies on the declaration filed by Mr. Burket to demonstrate why the Hill Report analysis is faulty. Burket Decl., ECF 58 at 9. Mr. Burket argues that it is necessary to factor out depreciation before calculating the Marine Division's operating income, and thus the focus should be on the Marine Division's OIBD. *Id.* at 9 ¶ 19. Depreciation is, as explained by Mr. Burket, "the accounting process of allocating the cost of tangible assets to expense in a systematic and rational manner to those periods expected to benefit from the use of the asset." *Id.* at 9-10 ¶ 20 (citing D. Kieso & J. Weygandt, *Intermediate Accounting* 529 (8th ed. 1995)). Mr. Burket argues that this calculation results in a more accurate reflection of the Port's operating cash flow, which is "the cash flow that results from the firm's day-to-day activities of producing and selling." *See id.*; *see also* Burket Decl. Ex. 2, ECF 58-1 at 15-17 (quoting S. Ross, R. Westerfield, et al., *Essentials of Corporate Finance* 26 (1996)).

The Port and Mr. Burket also provide an explanation of accounting income versus cash flow to explain why the Hill Report's method of calculating the Port's ability to finance the Programs is incorrect. Because depreciation is charged against income over the asset's depreciable life, the cost of depreciation is "deducted from sales revenue, along with such other costs as labor and raw materials," in order to determine taxable income. Burket Decl. Ex. 2, ECF 58-1 at 18-20 (quoting E. Bringham and L. Gapenski, *Financial Management Theory and Practice* 40 (8th ed. 1996)). Because the cash allocated to the depreciable asset was already

PAGE 36 – OPINION AND ORDER

expended, future depreciation that is charged is "not a cash outlay." *Id.* at 19; Burket Decl., ECF 58 at 10 ¶ 20. Thus, "[s]ince depreciation is a noncash charge, it must be added back to net income to obtain an estimate of the cash flow from operations." Burket Decl. Ex. 2, ECF 58-1 at 19. In contrast to accounting profits and losses, a firm's cash flows "are reported in the annual report" and are "designed to show how operations have affected the cash position" of the firm. *Id.* at 20.

Mr. Burket reviews the same financial reports provided to ILWU and cited in the Hill Report. For the Marine Division in the Port's fiscal period ending June 30, 2012, Mr. Burket documents OIBD at $4,673,104.73. Burket Decl. Ex. 3, ECF 58-1 at 26. Depreciation is listed as $10,687,921.83. *Id.* Consistent with the Hill Report's analysis, specifically Exhibit 3, if depreciation is included in the net income calculation for the Port's Marine Division, there would be a net operating loss of $6,014,817. *Compare id.* with Hill Report, ECF 51-1 at 48. By excluding depreciation costs, however, there is an operating profit and no operating loss. Similarly, for the fiscal period ending April 30, 2013,[7] OIBD is a positive $1,508,174.08. Burket Decl. Ex. 3, ECF 58-1 at 32. Depreciation for that period amounted to $9,074,255.71, which would yield a net operating loss of $7,566,081.63. *Id.* This portion of Mr. Burket's analysis is also consistent with the Hill Report's calculations. *See* Hill Report, ECF 51-1 at 48.

The Port's guideline document, *Managing the General Fund's Working Capital*, provides further support for the Port's argument that it had sufficient non-tax revenues to finance the Programs. The guideline document provides that "[i]f the Operating Income before Depreciation is negative at the end of a fiscal year, the Coverage Fund will be utilized to make up the

___

[7] The Port's fiscal year for 2013 ended on June 30, 2013. Because the parties were in the process of discovery and year-end statements were not yet available, the Port provided ILWU with the most recent financial statements available at the time.

difference." Second Foster Decl. Ex. 10, ECF 61-2 at 76. Property tax revenues are allocated

solely to the Coverage Fund. *Id.* This demonstrates that because the Port had a net positive OIBD

in all relevant fiscal years, the Port did not access funds sourced from property taxes.

The Port also submits its most recent annual audit, which was conducted and completed

by its external auditor PricewaterhouseCoopers LLP. The Port argues that this audit reflects

"substantial beginning and ending cash balances for the Port's 'Marine & Other' operations for

the years at issue." Defs.' Resp., ECF 57 at 33. On the Port's Balance Sheet for June 30, 2013,

the Port had cash and cash equivalents of $41,471,730. Burket Decl. Ex. 4, ECF 58-2 at 15. The

Port also argues that it had substantial working capital of $153,052,760. Defs.' Resp., ECF 57

at 33.[8] Aside from these two data points, the Statement of Revenues, Expenses, and Changes in

Net Position reflects a negative OIBD of $2,661,403. Burket Decl. Ex. 4, ECF 58-2 at 16. At the

bottom of the report, however, it is explained that "accompanying notes are an integral part of

these financial statements." *Id.* Note 2 to the Financial Statements provides "Identifiable Activity

Information" and reflects a high level financial summary for each of the Port's operational units.

The Marine & Other unit reported operating revenues of $30,342,000 and operating expenses of

$29,614,000, yielding a positive OIBD of $742,000. *Id.* at 23. The Port's broader point is that the

Port has sufficient capital and cash separate and apart from its property tax revenues to finance

the Programs.

ILWU's reply to the Port's depreciation argument is that depreciation should be

considered "a real and present expense" because otherwise the "Port would essentially be

---

[8] Although not a specific "line item" on the Port's balance sheet for the fiscal year ending June 30, 2013, working capital is calculated by subtracting current liabilities from current assets. Burket Dep., ECF 61-1 at 21. The Port's Balance Sheet reflects $187,790,281 in current assets, and $34,737,521 in current liabilities, yielding working capital in the amount of $153,052,760. Burket Decl. Ex. 4, ECF 58-2 at 15.

depleting the funds ultimately needed to repair or replace its capital assets." Pl.'s Reply, ECF 64 at 14. ILWU, citing to *Carruthers v. Port of Astoria*, argues that this potential effect on tax revenues demonstrates that there is a "possibility" of violating of Article XI, § 9 of the Oregon Constitution. *See* 249 Or. at 340 ("The constitutional prohibition, as herein construed, is to a giving of a public thing of value or a lending of credit in aid of a private corporation—a credit that has the possibility of general tax liability.").

In *Carruthers*, the Oregon Supreme Court held that there was "no way" the ordinance and bonds at issue could violate Article XI, § 9 given the restrictions they contained. *Id.* at 339. The Oregon Supreme Court did not, however, explain what was meant by the phrase "the possibility of a general tax liability," *id.* at 340, and this Court is not persuaded that the dictum cited by ILWU supports ILWU's arguments regarding depreciation. Further, this dictum falls squarely within the Oregon Supreme Court's consideration of what constitutes an expenditure for a public purpose, not an expenditure within the prohibition contained in Article XI, § 9. *Id.* Indeed, such indirect "possibilities" also appear to have been present in *Carruthers*, based on the fact that the Port of Astoria was able to use the bond funding to finance the private project at issue in that lawsuit and thereby shift other tax revenues to finance unrelated projects. *Id.* at 330, 340-42; *see also Miles*, 252 Or. at 534-37 (holding that Article XI, § 9 "does not prohibit a city from using funds raised from revenue bonds to acquire and operate a nuclear power plant jointly with a private utility").

ILWU does not cite to any support for its argument that depreciation is meant to allocate funds for future capital expenditures and must be used only for that purpose, rather than allocate the cost of a capital expenditure over the life of that asset. ILWU also argues that by not including depreciation costs, the Port is giving ICTSI infrastructure at Terminal 6 that the Port

purchased, at least in part, with tax revenues. *Id.* at 15. Finally, ILWU argues that any focus on the Port's cash flow fails to demonstrate either that the Port has sufficient operating profits to finance the Programs now or to finance the replacement or repair of capital assets that the Port intends to buy back from ICTSI. *Id.* at 17-18.

The Port's position that it has sufficient OIBD to finance the Programs excludes the consideration of depreciation. The Port's explanation of its management of cash assets conclusively establishes that it did not need to access non-operating revenue (such as property taxes) to finance the Programs. Pursuant to *DeFazio*, the Port may use revenues generated by operational activities to fund private projects. 296 Or. at 579; *see also Miles*, 252 Or. at 534 (holding that "[m]oney coming from revenue bonds and not from tax money does not fall within the prohibition" set forth in Article XI, § 9 of the Oregon Constitution).

Although ILWU maintains that depreciation ought to be considered, its primary support for that conclusion, the Hill Report, provides no explanation as to why depreciation as a non-cash accounting expense must be considered in calculating the Port's ability to finance the Programs. *Cf.* Burket Decl. Ex. 3, ECF 58-1 at 21-32. ILWU also fails to cite any treatises or secondary sources on accounting or finance that refute the accounting and finance principles cited by the Port. The Court finds that ILWU's reply is premised solely on argument and unsupported factual inferences and conclusions. Moreover, ILWU's focus on a potential or possibility for the Port to make future capital expenditures on the Programs that may be funded by property tax revenues assumes that the Court's prior order, which used the word "might," definitively established the legal standards to be applied under Article XI, § 9 of the Oregon Constitution. The Court is not persuaded by the speculative, future risk that the Port may have future capital expenditures that it cannot finance with non-tax revenues.

As previously stated, the Port's evidence conclusively establishes that it did not use or access non-operating revenues to fund the Programs. During the relevant time periods, the Port had a positive OIBD. Moreover, the Port's analysis of its operating income, excluding depreciation expenses, is a valid practice and not contradicted by material evidence or legal authority.

### c. Conclusion

ILWU has failed to demonstrate why the existence of comingled funds in a single bank account entitles it to summary judgment or to defeat the Port's motion for summary judgment. Moreover, the Port's extensive accounting and finance procedures conclusively rebut ILWU's argument that the mere coexistence of funds in a single account establishes a violation of Article XI, § 9. ILWU's arguments related to the Port's operating income are also without merit. The Port submitted conclusive evidence demonstrating that it had sufficient funding for the Programs. In short, there are no genuine issues of fact that require resolution by a jury, and summary judgment in favor of the Port is appropriate.

## CONCLUSION

The Court grants Defendants' Motion for Summary Judgment (ECF 21), denies ILWU's Motion for Summary Judgment (ECF 49), denies ILWU's motion to Strike Robert Burket's Clarification Declaration (ECF 48), and denies as moot ILWU's Motion for Leave to File a Second Amended Complaint to add a claim for prevailing plaintiff attorney's fees (ECF 47).

IT IS SO ORDERED.

DATED this 3rd day of April, 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge